UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WHOLESALE ALLIANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:18CV01015 AGF |
| | ) | |
| EXPRESS SCRIPTS , INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This antitrust action is before the Court on Defendant Express Scripts, Inc.'s ("Express Scripts") motion (ECF No. 15) to dismiss all five claims filed by Plaintiff Wholesale Alliance, LLC, d/b/a Pharmacy First ("Pharmacy First"). Express Scripts contends that Pharmacy First fails to state a claim under Section 1 of the Sherman Act in Counts I and II. If Counts I and II are dismissed, Express Scripts argues that the Court should decline to exercise supplemental jurisdiction over the state law claims asserted in Counts III and IV. Express Scripts also maintains that Counts III and IV should be dismissed for failure to state a claim. Finally, Express Scripts argues that Count V, asking for injunctive relief, should be dismissed as it is not an independent cause of action. For the reasons set forth below, the motion will be granted.

**BACKGROUND**

Pharmacy First is a pharmacy services administrative organization ("PSAO"). PSAOs provide administrative services to pharmacies, including processing claims,

1

providing operational support, and negotiating contracts with insurance companies and pharmacy benefit managers ("PBMs"). There are 22 PSAOs nationwide.

Express Scripts is a PBM. As such, Express Scripts administers prescription drug programs for its clients, which include commercial health plans, self-insured employer plans, Medicare Part D plans, the Federal Employees Health Benefits Program, and various state government employee plans. PBMs such as Express Scripts create pharmacy networks through which their clients' members may obtain prescription drugs at covered, discounted rates. Express Scripts' pharmacy network includes large chain pharmacies and smaller, independent pharmacies. According to the complaint, PBMs manage the prescription drug benefits of approximately 90-95% of Americans with insurance covering prescription drugs, and to be successful, independent pharmacies must participate in the largest PBM networks. Express Scripts controls 30-50% of the nationwide PBM market.

Pharmacies enter into contracts with Express Scripts to obtain access to its network of 83 million insured patients. These contracts between the pharmacies and Express Scripts detail, among other things, the rates that Express Scripts pays the pharmacies for prescription drugs and the credentialing and other requirements that Express Scripts, in turn, imposes on the pharmacies. Rather than negotiate these contracts with the PBMs themselves, many pharmacies—including roughly 80% of the 22,000 independent pharmacies in the United States—outsource this negotiation and other administrative tasks to PSAOs like Pharmacy First. Pharmacy First manages approximately 2,300 independent pharmacies nationwide.

On October 4, 2013, Pharmacy First and Express Scripts entered into the Amended and Restated PSAO Services Agreement. Pursuant to this Agreement, Express Scripts recognized Pharmacy First as a PSAO authorized to act on behalf of its affiliated pharmacies to negotiate network participation terms and conditions on the pharmacies' behalf. The PSAO Services Agreement required Express Scripts and the pharmacies affiliated with Pharmacy First to enter into a Pharmacy Provider Agreement, under which the pharmacies would participate in and provide prescription drugs and pharmacy services to Express Scripts' network of individuals with prescription drug benefits. The PSAO Services Agreement could "be terminated by [Express Scripts] without cause upon at least thirty (30) days written notice." ECF No. 9, Ex. A to Compl., § 4.2.a.

On March 11, 2018, Express Scripts sent a letter to Pharmacy First, terminating the PSAO Services Agreement without cause, effective June 29, 2018. Pharmacy First attached to its complaint correspondence from Express Scripts in which Express Scripts referenced the competitive Request for Proposal ("RFP") process that Express Scripts conducted prior to terminating Pharmacy First as an authorized PSAO. In the correspondence, Express Scripts noted that Pharmacy First submitted an unsuccessful bid but invited Pharmacy First to bid for its business in the future. *See* ECF No. 10, Ex. C to Compl., letter dated Mar. 22, 2018 (stating that Express Scripts "foresee[s] engaging in the RFP process again" and that it "look[s] forward to the possibility of partnering

together in the future."); *id.*, letter dated Apr. 23, 2018, at 1-2 (describing the RFP process and Pharmacy First's bid).[1]

Pharmacy First contends that its termination by Express Scripts "was the result of an agreement and other agreements reached between Express Scripts and four PSAOs that Express Scripts determined 'best align[ed]' with its 'organizational objectives' and 'm[et]' Express Scripts' 'terms and conditions.'" ECF No. 1 at ¶ 39. Pharmacy First maintains that prior to its termination, Express Scripts communicated its decision to use the four chosen PSAOs, to pharmacies affiliated with Pharmacy First. Pursuant to Pharmacy First's termination as an authorized PSAO, independent pharmacies wishing to access Express Scripts' network of insured members had to either work directly through Express Scripts or use the PSAO services of one of the four authorized PSAOs. Pharmacy First alleges that the four chosen PSAOs controlled approximately 70% or more of the market for PSAO services.

According to Pharmacy First, Express Scripts imposed the following burdens on independent pharmacies who attempted to access Express Scripts' network directly rather than through one of the four authorized PSAOs: (i) punitively low and non-negotiable reimbursement rates; (ii) fees; (iii) network restrictions; (iv) administrative burdens; and (v) a narrowed list of Express Scripts' selected reconciliation vendors who could be used to process electronic remittance advice from Express Scripts.

---

[1] Courts may consider exhibits attached to the complaint, as well as materials necessarily embraced by the pleadings, on a motion to dismiss. *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018).

Pharmacy First alleges that Express Scripts' actions caused Pharmacy First to lose existing and prospective pharmacy associations due to its exclusion from Express Scripts' network. Pharmacy First claims that access to Express Scripts' network is essential to PSAOs and pharmacies in order to compete in the pharmacy market.

On June 21, 2018, Pharmacy First filed suit against Express Scripts, seeking damages and injunctive relief. Pharmacy First alleges Express Scripts' actions were unlawful and anti-competitive, as independent pharmacies are essentially forced to use the four chosen PSAOs in order to access Express Scripts' network. Pharmacy First asserts that Express Scripts' actions constitute an exclusive dealing agreement (Count I) and a tying agreement (Count II), in violation of Section 1 the Sherman Act. In Count III, Pharmacy First brings a state law claim asserting that Express Scripts has tortiously interfered with Pharmacy First's contracts with its affiliated pharmacies. In Count IV, Pharmacy First alleges that Express Scripts' conduct constitutes a breach of the covenant of good faith and fair dealing implied by law into the parties' PSAO Services Agreement. In Count V, Pharmacy First seeks injunctive relief.

## ARGUMENTS OF THE PARTIES

In its motion to dismiss, Express Scripts argues that Pharmacy First fails to state a claim under Section 1 of the Sherman Act based on an exclusive dealing agreement between Express Scripts and the four authorized PSAOs (Count I) because Pharmacy First fails to plead facts in support of the elements of such a claim. Specifically, Express Scripts argues that Pharmacy First fails to plausibly plead that Express Scripts and the four PSAOs came to any agreement to deal exclusively with each other, that Express

5

Scripts has market power in the putative market for PSAO services, or that Express Scripts' actions have harmed competition in that market or have resulted in anticompetitive effects.

Express Scripts further argues that Pharmacy First fails to state a "tying" claim under Section 1 of the Sherman Act (Count II) because Pharmacy First does not plausibly allege that Express Scripts sells the purported "tying" product—access to Express Scripts' network; that Express Scripts has a direct economic interest in the purported "tied" product—PSAO services from one of the four authorized PSAOs; or that Express Scripts conditions access to its network on using a PSAO.

Next, Express Scripts argues that the Court should decline to exercise supplemental jurisdiction over the state law claims (Counts III and IV), or, alternatively, that these claims should be dismissed for failure to state a claim. Finally, Express Scripts argues that Pharmacy First's claim for injunctive relief (Count V) should be dismissed because injunctive relief is a remedy rather than an independent cause of action.

In response, Pharmacy First argues that it has adequately pled both "per se" violations and so-called "rule-of-reason" claims under Section 1 of the Sherman Act in Counts I and II. As to Count I, Pharmacy First argues that it has pled facts in support of an express or implied exclusive dealing agreement between Express Scripts and the four PSAOs to "cut off" access to Express Script's network by Pharmacy First and the other 17 PSAOs that were terminated by Express Scripts. Pharmacy First further argues that it has adequately pled injury by pleading that Express Scripts' actions foreclose competition in the PSAO-services market and, in turn, harm independent pharmacies by

6

increasing their costs and denying them free choice in PSAO services. Pharmacy First also argues that Express Scripts has significant power in the PSAO services market because PSAOs need access to Express Scripts' network in order to compete.

As to Count II, Pharmacy First argues that it states a plausible tying claim because it alleges that Express Scripts charges pharmacies a service fee in exchange for access to Express Scripts' network, thus alleging that Express Scripts "sells" such access (the alleged tying product). Pharmacy First likewise argues that it adequately alleges that Express Scripts explicitly, or at least implicitly, conditions access to its network on the purchase of PSAO services from one of the four authorized PSAOs (the alleged tied product). Specifically, Pharmacy First points to its allegation that Express Scripts imposes substantial burdens on independent pharmacies attempting to access its network directly, making such direct access economically unviable and, in effect, forcing pharmacies to use one of the four PSAOs. Finally, Pharmacy First argues that the Eighth Circuit does not require a defendant to have an economic interest in the tied product in order to state a tying claim but that, in any event, Express Scripts has an economic interest in the tied PSAO services because consolidating the PSAOs it works with allows Express Scripts to reduce "administrative costs" and secure a "centralized reimbursement structure." ECF No. 23 at 21.

Next, Pharmacy First argues that it states plausible claims in Counts III and IV, for tortious interference and breach of the implied covenant of good faith and fair dealing under Missouri law. Lastly, Pharmacy First argues that its request for injunctive relief in Count V is supported by the other alleged claims in the complaint.

In Express Scripts' reply brief and in a surreply filed by Pharmacy First with leave of the Court, the parties essentially reiterate their arguments for and against dismissal.

## **DISCUSSION**

To survive a motion to dismiss, a plaintiff's claims must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The reviewing court accepts the plaintiff's factual allegations as true and draws all reasonable inferences in favor of the nonmoving party. *Torti v. Hoag*, 868 F.3d 666, 671 (8th Cir. 2017). But "[c]ourts are not bound to accept as true a legal conclusion couched as a factual allegation, and factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

There is no heightened pleading requirement for antitrust claims. *Foam Supplies, Inc. v. Dow Chem. Co.*, No. 4:05CV1772 CDP, 2006 WL 2225392, at *3 (E.D. Mo. Aug. 2, 2006). However, "[g]iven the unusually high cost of discovery in antitrust cases, the limited success of judicial supervision in checking discovery abuse, and the threat that discovery expense will push cost-conscious defendants to settle even anemic cases, the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage." *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (citations omitted).

**Antitrust Claims (Counts I and II)**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 1. Not every agreement that restrains competition violates the Sherman Act. *See Craftsmen*

*Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 386 (8th Cir. 2007). Rather, Supreme Court precedents have "understood § 1 to outlaw only *unreasonable* restraints." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (citation omitted).

To establish a claim under Section 1 of the Sherman Act, a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade; and (3) that the restraint affected interstate commerce. *HM Compounding Servs., Inc. v. Express Scripts, Inc.*, No. 4:14-CV-1858 JAR, 2015 WL 4162762, at *3 (E.D. Mo. July 9, 2015). Whether an agreement unreasonably restrains trade is determined under one of two approaches: the per se standard or a standard that examines all of the circumstances, the so-called rule of reason test. *Am. Express Co.*, 138 S. Ct. at 2283; *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1058 (8th Cir. 2000). Moreover, to demonstrate standing, a plaintiff must plausibly plead "that he has suffered an 'antitrust injury,'" which is an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006).

**Exclusive Dealing Claim (Count I)**

Pharmacy First argues that it has pled an exclusive dealing claim in Count I under both the per se and rule of reason approaches. The Court will first address Pharmacy First's argument that it has adequately pled a per se violation. Per se liability is reserved for those agreements that are so obviously anti-competitive that unreasonableness is presumed and the agreements are deemed unlawful. *Craftsmen Limousine, Inc.*, 491 F.3d

9

at 387.  Courts have "long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition . . . that they should be condemned as per se violations of § 1 of the Sherman Act.'"  *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 591 (8th Cir. 1987) (citation omitted); *see also Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 293 (1985) ("Group boycotts are often listed among the classes of economic activity that merit per se invalidation under § 1.").  However, "[p]recedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct competitors."  *Brookins v. Int'l Motor Contest Ass'n*, 219 F.3d 849, 852 n.3 (8th Cir. 2000) (internal quotation marks omitted); *Am. Express Co.*, 138 S. Ct. at 2283–84 ("Typically only 'horizontal' restraints—restraints imposed by agreement between competitors—qualify as unreasonable per se.") (citation omitted).

Pharmacy First fails to plausibly plead concerted action among horizontal competitors.  The complaint contains no facts plausibly demonstrating that the four PSAOs conspired or colluded amongst themselves to enter into an agreement with Express Scripts requiring Express Scripts to refuse to deal with Pharmacy First or other PSAOs.  Instead, the complaint alleges that Express Scripts "determined [the four chosen PSAOs] 'best align[ed]' with its 'organizational objectives' and 'm[et]' Express Scripts' 'terms and conditions.'"  ECF No. 1 at ¶ 39.  The complaint also attaches correspondence from Express Scripts indicating that Pharmacy First was terminated as an authorized PSAO pursuant to a competitive RFP process.  In this letter, Express Scripts notes that

10

the RFP process involved a review of Pharmacy First's historical performance, including its compliance with the PSAO Services Agreements' terms and obligations.

While the Court agrees with Pharmacy First that the mere existence of an RFP process does not necessarily warrant dismissal of an exclusive-dealing claim, the presence of a competitive bidding process "is a factor to be considered in determining the applicability of the antitrust laws." *See Coal. For ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 503 (9th Cir. 2010). And Pharmacy First pleads no facts plausibly suggesting that this RFP process was rigged or a sham. *Cf. Nilavar v. Mercy Health Sys. W. Ohio*, 142 F. Supp. 2d 859, 877 (S.D. Ohio 2000) (refusing to dismiss an exclusive-dealing claim based on a hospital's exclusive provider agreement where the court concluded that the complaint pled sufficient facts to infer the RFP process preceding the award of the provider agreement was a sham); *but see Nilavar v. Mercy Health Sys.-W. Ohio*, 494 F. Supp. 2d 604, 619 (S.D. Ohio 2005) (later granting the hospital summary judgment where the evidence did not bear out the plaintiff's allegations), *aff'd*, 244 F. App'x 690 (6th Cir. 2007).

The Court finds that the allegations contained in the complaint suggest only a unilateral determination by Express Scripts to terminate Pharmacy First, rather than a horizontal agreement among Pharmacy First's direct competitors. *See Lomar Wholesale Grocery, Inc.*, 824 F.2d at 590 ("[R]efusals to deal involving no concerted action between horizontal competitors do not constitute per se unlawful group boycotts. Rather, the refusals should be treated as vertical restraints, and will be subject to rule-of-reason

analysis . . . [.]"). As such, the Court finds that Pharmacy First has not pled a per se violation based upon a concerted refusal to deal in Count I.

Because Pharmacy First has not pled a plausible per se violation, the Court turns to Pharmacy First's alternative argument that Count I states a rule-of-reason claim under exclusive dealing principles. In contrast to the per se approach, under the rule of reason test, determining whether a practice imposes an unreasonable restraint on trade requires courts to examine all of the facts disclosed on the record and to weigh all the circumstances. *Concord Boat*, 207 F.3d at 1058. Where, as here, the plaintiff has alleged an exclusive dealing claim, the Court must consider whether an exclusive agreement has foreclosed competition in a relevant market. *Id.* at 1058-59.

To allege trade was unreasonably restrained through the use of an exclusive agreement, Pharmacy First must establish concerted action. "'To satisfy the concerted action requirement, the plaintiff must demonstrate that the defendants shared a unity of purpose or a common understanding, or a meeting of the minds.'" *Insulate*, 797 F.3d at 543–44 (brackets and internal quotations omitted) (quoting *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1273 (8th Cir. 1983). Pleading parallel or other conduct "merely consistent with [an] agreement" is not sufficient to show a conspiracy. *Twombly*, 550 U.S. at 557. As a matter of right, a private business is free to conduct business with whomever it chooses to the exclusion of others. *Insulate*, 797 F.3d at 543–44; *see also Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws were enacted for 'the protection of competition not competitors'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). "[T]he crucial question is whether

12

the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly,* 550 U.S. at 553 (citation omitted).

Pharmacy First asserts that it has alleged exclusive agreements between Express Scripts and the four PSAOs that required Express Scripts to terminate its contract with Pharmacy First and deal only with the four PSAOs. In support of this assertion, Pharmacy First points to the following allegations in the complaint: that Pharmacy First was terminated as an authorized PSAO; that Express Scripts informed pharmacies that it was contracting only with the four PSAOs; and that Express Scripts further instructed pharmacies that if the they wished to access Express Scripts network utilizing a PSAO, they had to affiliate with one of the chosen four.

But these allegations reference nothing more than the end result of an RFP process. They do not plausibly suggest any collusion between Express Scripts and the four PSAOs to exclude Pharmacy First and other PSAOs. It cannot be reasonably inferred from these facts that Express Scripts agreed with the four PSAOs to deal exclusively with them and to terminate Pharmacy First's access to its network. Instead, as discussed above, the complaint describes a unilateral determination by Express Scripts to contract with the four PSAOs after a competitive bid process. Such an independent business decision does not constitute unlawful concerted action. *See, e.g., Cable Line, Inc. v. Comcast Cable Commc'ns of Pa., Inc*., No. 3:16-CV-1000, 2017 WL 4685359, at *6 (M.D. Pa. Oct. 18, 2017) (dismissing exclusive dealing claim based on a cable company's consolidation of its contracted installers through a competitive bid process where the complaint's "allegations, on their face, indicate[d] that [the cable company]

13

made the decision to terminate [the losing installers] by itself, without influence from or collaboration with [the winning ones]"). Accordingly, the Court will grant Express Scripts' motion to dismiss Count I.[2]

**Tying Claim (Count II)**

"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Park Irmat Drug Corp.*, 911 F.3d at 518. "For a plausible tying claim in this situation, [a plaintiff must allege] that Express Scripts conditioned participation in its PBM network on either the purchase of a tied product or service, or on refraining from the purchase of a tied product or service." *Id.*

Pharmacy First does not plead a typical tying claim; nor has it plausibly pled facts bringing its atypical claim within the confines of the Sherman Act. First, "[t]ypically, an express refusal to sell the tying product without the tied product is the basis for an illegal tying arrangement." *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500 (8th Cir. 1992). "In cases where there is no explicit agreement which conditions the purchase of the tying

---

[2] As Pharmacy First notes in its surreply, the Ninth Circuit in *Coal. For ICANN Transparency, Inc.*, 611 F.3d at 503, permitted one exclusive dealing claim to go forward where the exclusive agreement lacked any competitive bidding, and the plaintiff further alleged that the exclusive agreement was the result of a conspiracy in which the provider being granted exclusivity agreed to share its monopoly profits with the defendant and to cease predatory behavior which had put the defendant in financial jeopardy. But the court dismissed another exclusive dealing claim where the exclusive agreement was the result of a competitive bidding process, and the plaintiff had not adequately alleged any conspiratorial conduct. Pharmacy First's complaint contains no facts similar to the surviving claim in *Icann* but instead mirrors the allegations of the dismissed claim.

14

product upon the purchase of the tied product, an illegal arrangement may still be shown if the defendant's policy makes the purchasing of the tying and tied products together the only viable economic option." *Id.*

Pharmacy First has not pled the existence of an explicit agreement conditioning the purported tying product (access to Express Scripts' network) on the purchase of the purported tied product (PSAO services from one of the four authorized PSAOs).[3] Indeed, Pharmacy First admits that pharmacies were free to contract directly with Express Scripts for access to Express Scripts' network, rather than using any PSAO service. Pharmacy First further alleges that, at one point, roughly 20% of independent pharmacies contracted with PBMs such as Express Scripts directly, suggesting that doing so was not economically prohibitive.[4] And upon careful review of the complaint, the Court concludes that Pharmacy First has not sufficiently pled that, after announcing its intent to use the four authorized PSAOs, Express Scripts imposed such significant new burdens as to render direct contracts with Express Scripts no longer economically viable going forward.

In particular, Pharmacy First pleads that Express Scripts imposed "punitively low" reimbursement rates, "network restrictions," "fees," and other administrative burdens on

---

[3] The Court assumes, without deciding, that (1) access to Express Scripts' network and (2) PSAO services from one of the four authorized PSAOs constitute distinct products or services for the purpose of a tying claim. Express Scripts does not contest this point in its motion.

[4] The complaint does not allege what percentage of all pharmacies, as opposed to just independent pharmacies, contract directly with PBMs and with Express Scripts in particular.

pharmacies attempting to contract directly with Express Scripts. Although the complaint does not make clear when these burdens were imposed, Pharmacy First suggests in its opposition brief that the burdens were imposed as part of Express Scripts' decision effective June 29, 2018, to use the four authorized PSAOs. As such, Pharmacy First contends that "[w]hile directly accessing [Express Scripts'] network may have been a viable option for a small subset of independent pharmacies before the tie, [Express Scripts'] recent imposition of [these] onerous burdens on pharmacies wishing to continue direct access in or around June 2018 make that path unviable going forward." ECF No. 23 at 20.

But Pharmacy First does not allege facts demonstrating how these alleged burdens render direct contracts unviable. For example, Pharmacy First does not allege the amounts of the reimbursement rates and the fees; how these alleged rates, fees, restrictions, and other administrative burdens compare to the terms Express Scripts offers pharmacies using a PSAO and to the terms Express Scripts previously imposed on pharmacies contracting with it directly; and/or how many pharmacies have actually chosen to use a PSAO rather than contracting with Express Scripts directly in light of the new burdens. *See, e.g., Eastman v. Quest Diagnostics Inc.*, No. 15-cv-415, 2016 WL 1640465, at *12 (N.D. Cal. Apr. 26, 2016) (dismissing tying claim where plaintiffs alleged "that medical providers' 'only viable economic option' [wa]s to purchase capitated testing at the discounted rates offered to those medical providers who also refer their fee-for-service testing to Quest" because they did not allege facts to make this conclusion plausible, such as the difference in pricing or the approximate number of

16

providers who actually entered into discounted capitated agreements based on their referral of fee-for-service business), *aff'd*, 724 F. App'x 556 (9th Cir. 2018).

Second, typically, "a tying arrangement is defined as the sale or lease of one item (the tying product) on the condition that the buyer or lessee purchase a second item (the tied product) from the *same source*." *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 666 F.2d 1130, 1140 (8th Cir. 1981) (emphasis added). Where, as here, "a third party is involved in selling the tied product to the plaintiff, most courts have required that the tying product seller have a direct economic interest in the sale of the tied product before an illegal tying arrangement will be found." *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1265–66 (10th Cir. 2006) (also citing cases from the Fourth, Sixth, and Ninth Circuits); *but see Gonzalez v. St. Margaret's House Hous. Dev. Fund Corp.*, 880 F.2d 1514, 1517 (2d Cir. 1989).

Although neither the Supreme Court nor the Eighth Circuit has addressed the issue,[5] the Court finds persuasive the rationale of those circuits that have adopted the "economic interest" requirement. These circuits have reasoned that "if the tying product seller does not have an economic interest in the sale of the tied product, the seller is not attempting to invade the alleged tied product or service market in a manner proscribed by

---

[5] In *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984), the case relied upon by Pharmacy First, the hospital defendant sold both the tying product, hospital services, and the tied product, anesthesiology services. *See* 466 U.S. at 6 n.4 (noting that "[t]he fees for anesthesiological services are billed separately to the patients by the hospital," and thereafter "divided equally between [the anesthesiologist being granted exclusivity] and the hospital"), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006)). Therefore, as Express Scripts notes, the Supreme Court had no reason to address the requirements of a tying claim involving a third-party seller of the tied product.

17

section 1 of the Sherman Act." *Abraham*, 461 F.3d at 1266; *see also Rosebrough Monument Co.*, 666 F.2d at 1140 (explaining that tying arrangements may harm competition because "[t]ying sellers, who may hold a legitimate monopoly of the tying product, are often working towards an illegitimate monopoly of the tied product").

Pharmacy First does not plausibly plead that Express Scripts has a direct economic interest in the purported tied product, PSAO services from one of the four authorized PSAOs. The complaint's references to reduced administrative costs and a centralized reimbursement structure, while perhaps constituting legitimate business reasons for Express Scripts' decision to consolidate its PSAO service providers, does not constitute a direct economic interest. *See CTUnify, Inc. v. Nortel Networks, Inc.*, 115 F. App'x 831, 835 (6th Cir. 2004) (requiring a tying seller to derive "not merely an indirect benefit," but "a direct financial benefit" from the sale of the tied product, such as receipt of a "portion of the profits" or "some sort of payment in exchange for bestowing . . . exclusive right[s]"). Absent such direct economic interest, Express Scripts would have little interest in reducing competition in the PSAO services market because, as Express Scripts notes, doing so would only increase the remaining PSAOs' bargaining power against Express Scripts. *See, e.g., Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66 (1st Cir. 2004) ("[C]ourts tend to be skeptical of [exclusive dealing] claims because it is not in the long-term interest of the company that grants the 'exclusive

18

deal' to drive out of business competitors of the grantee."). For these reasons, the Court will grant Express Scripts' motion to dismiss Count II.[6]

**Counts III, IV, and V**

Because Counts I and II will be dismissed, the Court declines to exercise supplemental jurisdiction over Pharmacy First's state law claims in Counts III and IV. *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 792 (8th Cir. 2006) ("When a district court dismisses federal claims over which it has original jurisdiction, the balance of interests usually will point toward declining to exercise jurisdiction over the remaining state law claims."). Those claims will be dismissed without prejudice. The Court will dismiss Count V with prejudice, as injunctive relief is a remedy and not an independent cause of action. *Henke v. Arco Midcon, L.L.C.*, 750 F. Supp. 2d 1052, 1059–60 (E.D. Mo. 2010).

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendant Express Scripts, Inc.'s motion to dismiss is **GRANTED as follows**: Counts I, II, and V are **DISMISSED with prejudice**;

---

[6] In a footnote in its opposition brief, Pharmacy First suggests that, to the extent the Court finds merit in any of Express Scripts' arguments, Pharmacy First should be permitted leave to file an amended complaint containing additional allegations. But the one "fact" noted, namely, that Express Scripts advised Pharmacy First that it had reached agreements with the four selected PSAOs (ECF No. 23 at 2 n.2), does nothing to change the analysis. And though permitted to file a surreply, Pharmacy First suggested no additional facts that it could allege in an amended complaint. *See Cornelia I. Crowell GST Tr. v. Possis Med., Inc.*, 519 F.3d 778, 783 (8th Cir. 2008) ("Generally, parties should not be allowed to amend their complaint without showing how the complaint could be amended to save the meritless claim.") (citation omitted).

Counts III and IV are **DISMISSED without prejudice**. ECF. No. 15.

All claims against all parties having been resolved, the Court will enter a separate Order of Dismissal.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 4th day of February, 2019.